FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2024 DEC 31  PM 3:59

MARGARET BOTKINS, CLERK
CASPER

# UNITED STATES DISTRICT COURT
# DISTRICT OF WYOMING

STATE OF WYOMING,

    Petitioner,

  v.

THE UNITED STATES DEPARTMENT OF
THE INTERIOR, *et al.*,

    Respondents, and

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

    Intervenor-Respondents.

**Case No. 22-CV-247-SWS (Lead Case)**

---

WESTERN ENERGY ALLIANCE, *et al.*,

    Petitioners,

  v.

DEB HAALAND, in her official capacity as
Secretary of the Interior, *et al.*,

    Respondents, and

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

    Intervenor-Respondents.

Case No. 22-CV-252-SWS (Joined Case)

---

WESTERN ENERGY ALLIANCE, *et al.*,

    Petitioners,

  v.

DEB HAALAND, in her official capacity as
Secretary of the Interior, *et al.*,

    Respondents, and

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

    Intervenor-Respondents.

Case No. 23-CV-001-SWS (Joined Case)

**ORDER UPHOLDING IN PART AND REMANDING IN PART AGENCY ACTION ON JUDICIAL REVIEW**

These joined cases come before the Court under the Administrative Procedure Act (APA) for judicial review of the Department of Interior's (DOI) failure to hold any lease sales of federal lands for the purpose of oil and gas development during the second and third quarters of 2021 as well as the third and fourth quarters of 2022. The administrative record has been submitted and supplemented (ECF 34, 44, 52[1]), and the parties and intervenors have fully briefed the issues and provided exhibits and supplementation (ECF 53, 54, 61, 62, 63, 65, 66, 72). Having considered the parties' arguments and reviewed the record, the Court finds the challenged agency actions must be upheld in part and remanded in part.

## INTRODUCTION

The Mineral Leasing Act of 1920 (MLA), 30 U.S.C. §§ 181 *et seq.*, grants authority to the Secretary of the Department of Interior (DOI) to lease parcels of federal land for the purpose of developing natural resources (e.g., oil, coal, natural gas, sodium, potassium, etc.). *See, e.g.,* 30 U.S.C. § 226(a) ("All lands subject to disposition under this chapter which are known or believed to contain oil or gas deposits may be leased by the secretary."). Generally, federal parcels to be leased for purposes of natural resource development are offered for leasing through a competitive bidding process known as "lease sales." *See* 30 U.S.C. § 226(b). "Private individuals or entities may file Expressions of Interest (EOIs) to suggest [nominate] parcels for consideration for leasing by the BLM. The authorized officer may also identify lands for leasing consideration." BLM-Q3003311; *see* ECF 35-2, 35-33 (listing Wyoming parcels nominated for leasing in 2021 and

---

[1] All citations to filed documents are to Case No. 22-CV-247-SWS as the lead case unless otherwise noted.

2022).  "Lease sales shall be held for each State where eligible lands are available at least quarterly…."  30 U.S.C. § 226(b)(1)(A).

At issue in this judicial review action is the fact that the DOI Secretary failed to hold any lease sales anywhere in the United States during quarters two and three in 2021 and during quarters three and four in 2022.  Petitioners allege the DOI's failures to hold any lease sales during these quarters were not in accordance with governing law, were arbitrary or capricious, and constituted abuses of discretion.

## STANDARD FOR JUDICIAL REVIEW OF AGENCY ACTION

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999) (internal quotation marks omitted).  The Administrative Procedure Act includes a limited waiver of sovereign immunity that allows for judicial review of "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  The APA authorizes a judicial review action by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702.

As relevant here, the APA sets forth a court's authority to review an agency's action as follows:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (1)    compel agency action unlawfully withheld or unreasonably delayed; and
> (2)    hold unlawful and set aside agency action, findings, and conclusions found to be—
>        (A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>        …
> In making the foregoing determinations, the court shall review the whole record or

those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

Review under § 706(1) occurs "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphases in original). The limitation that it be a "discrete" agency action precludes broad programmatic attacks because a program is not an "agency action." *Id.* "The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law …." *Id.* at 65 (emphasis in original).

Under § 706(2), reviewing agency action for its compliance with law is mostly a straightforward application of the law to the facts. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 318 (1979) ("any disclosure that violates [18 U.S.C.] § 1905 is 'not in accordance with law' within the meaning of 5 U.S.C. § 706(2)(A)").

Also, under § 706(2), determining whether agency action is arbitrary and capricious is generally the same as determining whether it was an abuse of discretion. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (reviewing the claim that the Secretary of Commerce abused his discretion "under the deferential 'arbitrary and capricious' standard"). The scope of review for arbitrary-and-capricious/abuse-of-discretion is "narrow." *Id.* The Court determines "only whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Am. Petroleum Inst. v. United States Dep't of Interior*, 81 F. 4th 1048, 1058 (10th Cir. 2023). The Court does not substitute its own judgment for the agency's but instead only determines whether the agency "remained 'within the bounds of

reasoned decisionmaking.'" *Dep't of Commerce*, 139 S. Ct. at 2569 (quoting *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105 (1983)).

To avoid arbitrary and capricious action, "the agency cannot (1) rely on factors deemed irrelevant by Congress; (2) fail to consider important aspects of [the] problem; (3) present an explanation that is either implausible or contrary to the evidence; or (4) reach a decision that is not supported by substantial evidence in the [administrative] record." *Id.* (alterations in original) (internal quotation marks omitted). Similarly, the Tenth Circuit has described an "abuse of discretion" as "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011) (quoting *Attorney Gen. of Okla. v. Tyson Foods, Inc.,* 565 F.3d 769, 776 (10th Cir. 2009)).

"When assessing whether such errors occurred, our inquiry 'must be thorough, but the standard of review is very deferential to the agency'—we presume its action is valid, and the party challenging that action bears the burden of proving otherwise." *Am. Petroleum Inst.*, 81 F.4th at 1058 (quoting *Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1165 (10th Cir. 2012)). The Court "is not to substitute its judgment for that of the agency," and the Court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks omitted). The Court "will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 286 (1974)).

## **BACKGROUND**

The MLA sets the backdrop for the parties' dispute in this case, and it provides that certain federal lands "which are known or believed to contain oil or gas deposits may be leased by the

Secretary." 30 U.S.C. § 226(a).  It also requires leases to be offered for competitive bidding (lease

sales) and says in part: "Lease sales shall be held for each State where eligible lands are available

at least quarterly and more frequently if the Secretary of the Interior determines such sales are

necessary…." 30 U.S.C. § 226(b).  The DOI Secretary's authority and discretion for onshore

leasing has been delegated to the Bureau of Land Management (BLM).  BLM-Q2000485.

**Administration of Federal Land Leasing for Oil and Gas Development**

The Tenth Circuit has summarized BLM's public land leasing regime on multiple

occasions:

> The MLA and accompanying regulations establish the procedures for development
> of oil and gas deposits on federal land.  The Secretary has authority under the Act
> to lease all federal lands "which are known or believed to contain oil or gas
> deposits." 30 U.S.C. § 226(a).  BLM state offices administer these leases through
> lease sales.  The lease sales at issue in this case are competitive lease sales, where
> entities bid at an auction and the highest bidder wins the ability to lease parcels for
> oil and gas development.  *Id.* § 226(b)(1)(A) ("The Secretary shall accept the
> highest bid from a responsible qualified bidder which is equal to or greater than the
> national minimum acceptable bid...."). Parcels that will be auctioned are identified
> by the BLM in a public Notice of Competitive Lease Sale ….

*W. Energy Alliance v. Salazar*, 709 F.3d 1040, 1042-43 (10th Cir. 2013).  "Both the MLA and

the associated regulations provide for quarterly lease sales." *W. Energy Alliance v. Zinke*, 877

F.3d 1157, 1161 (10th Cir. 2017).

> The BLM "manages the use of federal oil and gas resources through a three-phase
> decision-making process." *Pennaco Energy, Inc. v. United States Dep't of Interior*,
> 377 F.3d 1147, 1151 (10th Cir. 2004).  In the first phase, the BLM develops
> resource management plans ("RMPs"). 43 U.S.C. § 1712; 43 C.F.R. Part 1600.
> RMPs indicate which parcels of public land are open or closed to oil and gas
> development.  When drafting RMPs, the BLM is required by statute to apply
> multiple use management, which "describes the ... task of striking a balance among
> the many competing uses to which land can be put, 'including, but not limited to,
> recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving]
> natural scenic, scientific and historical values.'" *Norton v. S. Utah Wilderness All.,*
> 542 U.S. 55, 58, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) (quoting 43 U.S.C. §
> 1702(c)).  Additionally, the BLM "prepare[s] an environmental impact statement"
> in compliance with the National Environmental Protection Act (the "NEPA") when

preparing an RMP. 43 C.F.R. § 1601.0-6. Generally, an RMP "describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps." *Norton*, 542 U.S. at 59, 124 S.Ct. 2373. The applicable regulations also require that the public must have a chance "to become meaningfully involved in and comment on the preparation and amendment of" RMPs. 43 C.F.R. § 1610.2(a). All subsequent activity on the land, including oil and gas development, must conform to RMPs. *See* 43 C.F.R. § 1610.6-3(a).

In the second phase, through its State Offices, the BLM identifies specific parcels that it will offer for lease in the competitive lease sale process. 43 C.F.R. Subpart 3120. The BLM retains discretion to choose which parcels to lease. *W. Energy All. v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013). "'Eligible' lands comprise all lands 'subject to leasing, i.e, lands not excluded from leasing by a statutory or regulatory prohibition.' 'Available' lands are those 'open to leasing in the applicable [RMP], ... when all statutory requirements and reviews have been met.'" Amicus Br. at 6 n.2 (quoting BLM Manual 3120.11).

Also in the second phase, after a State Office decides which parcels to offer in a lease sale, the State Office posts a final sale notice listing those parcels at least 45 days before the sale date, and often 90 days before. 43 C.F.R. § 3120.4-2; App. at 187 (BLM Manual 3120 (updated February 18, 2013)). Once the notice is posted, the BLM's practice is to provide a 30-day protest period. App. at 187 (BLM Manual 3120 (updated February 18, 2013)). While a protest is pending, the BLM can suspend a specific parcel from the offering. 43 C.F.R. § 3120.1-3. Although "[s]tate offices should attempt to resolve protests before the sale of the protested parcels," protests unresolved by the lease auction date do not prevent bidding on the contested parcel. App. at 187 (BLM Manual 3120 (updated February 18, 2013)). If an RMP identifies land as open to development, a State Office can publish in the Federal Register a call for expressions of leasing interest, which anyone may file. *See* App. at 134. The regulations provide that "[l]ands included in any expression of interest" are "available for leasing" and "shall be offered for competitive bidding." 43 C.F.R. § 3120.1-1(e). The State Office then conducts a competitive lease sale auction. *See* 30 U.S.C. § 226(b)(1)(A).

. . .

Finally, after selling a lease, and as part of the third phase of the BLM's decision-making process, the BLM also decides whether specific development projects will be permitted on the leased land. The BLM's authority in this regard originates with the MLA, which gives the BLM the power to "regulate all surface-disturbing activities conducted pursuant to any lease issued under" the MLA and to set reclamation and other requirements necessary to conserve any surface resources. § 226(g); *see generally* 43 C.F.R. § 3162.3-1 (providing for drilling applications and plans).

*W. Energy Alliance v. Zinke*, 877 F.3d at 1161-63 (internal footnoted omitted). The Tenth Circuit

has further discussed BLM's discretion to lease public lands:

> Before the MLA was amended by the Federal Onshore Oil and Gas Leasing Reform Act of 1987 ("Reform Act"), it was well established that the Secretary had extremely broad discretion and was not obligated to issue any lease on public lands. *See Udall v. Tallman,* 380 U.S. 1, 4, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) (even though the MLA "directed that if a lease were issued on such a tract, it had to be issued to the first qualified applicant, it left the Secretary discretion to refuse to issue any lease at all on a given tract"). We consistently affirmed the broad discretion afforded to the Secretary under the MLA. In *Justheim Petroleum Co. v. Dep't of the Interior,* 769 F.2d 668 (10th Cir. 1985), a case arising in the non-competitive bidding context, we held that "the Secretary is under no requirement to issue or reject lease applications within a certain time limit." *Id.* at 670. Similarly, in *McDonald v. Clark,* 771 F.2d 460 (10th Cir. 1985), we concluded that the Secretary had the discretion to withdraw a lease from the non-competitive leasing process even after he had determined the first qualified applicant. *Id.* at 463. We held that until the Secretary actually acts to issue the lease, the applicant has only a "hope or ... expectation of a lease" and not a vested right. *Id.*

> The MLA, as amended by the Reform Act of 1987, continues to vest the Secretary with considerable discretion to determine which lands will be leased. Under 30 U.S.C. § 226(a), "[a]ll lands subject to disposition under this chapter which are known or believed to contain oil or gas deposits *may be leased* by the Secretary," (emphasis added) and the Secretary still retains the authority to determine which lands are "to be leased" under § 226(b)(1)(A). The Reform Act did, however, change the federal onshore leasing process in several respects, including shifting the majority of leases previously offered through a non-competitive bidding process to a competitive bidding process (which explains why virtually all of our pre-Reform Act cases arose in the context of non-competitive bidding).

*W. Energy Alliance v. Salazar*, 709 F.3d at 1044 (internal footnoted omitted).

It is undisputed that the DOI, acting through its BLM agency, did not hold any lease sales for the middle two quarters of 2021 (i.e., April through June and July through September) and the final two quarters of 2022 (i.e., July through September and October through December). The State of Wyoming, the Petitioner in the lead case of 22-CV-247-SWS, challenges the lack of lease sales covering Wyoming lands during Q2 2021, Q3 2021, and Q3 2022. (*See* ECF 6.) Western Energy Alliance and Petroleum Association of Wyoming (collectively, "Industry Petitioners") are the Petitioners in the joined cases of 22-CV-252 and 23-CV-001, and they challenge the lack of

lease sales for Q3 2022 and Q4 2022.  (*See* 22-CV-252 ECF 1; 23-CV-1 ECF 1.)  The Intervenor-Respondents consist of various conservation and environmental organizations, and they are aligned with BLM in this action.

### Second Quarter 2021 (April through June)

Early in his presidential term, on January 27, 2021, President Biden issued Executive Order 14008, titled "Tackling the Climate Crisis at Home and Abroad," which provided in relevant part:

> **Sec. 208.**  *Oil and Natural Gas Developments on Public Lands and in Offshore Waters.*  To the extent consistent with applicable law, the Secretary of the Interior shall pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and in offshore waters, including potential climate and other impacts associated with oil and gas activities on public lands or in offshore waters.  The Secretary of the Interior shall complete that review in consultation with the Secretary of Agriculture, the Secretary of Commerce, through the National Oceanic and Atmospheric Administration, and the Secretary of Energy.  In conducting this analysis, and to the extent consistent with applicable law, the Secretary of the Interior shall consider whether to adjust royalties associated with coal, oil, and gas resources extracted from public lands and offshore waters, or take other appropriate action, to account for corresponding climate costs.

Exec. Order No. 14008, 86 Fed. Reg. 7619, 7624-25 (Jan. 27, 2021) (BLM-Q2000053).

In early February 2021, Wyoming's BLM state office submitted a request to BLM headquarters seeking authorization to hold a lease sale during Q2 2021 covering 37 parcels within the State.  BLM-Q2000064-0066.  Nothing in the record indicates BLM headquarters ever executed a decision on this request.  *See* BLM-Q2000066 (showing neither line for "concur" and "do no concur" signed).  Other state BLM offices similarly submitted similar requests for the Q2 2021 lease sale that was to be held in late June 2021.  *See* BLM-Q2000358-60 (Montana/Dakotas BLM state office's request for authorization to post information for Q2 lease sale that would cover 11 parcels in North Dakota).  And like Wyoming's request, the other requests also went without a

response.  *See* BLM-Q2000360 (showing no selection for "do approve" or "do not approve");
BLM-Q2000393 (March 29, 2021 email from Montana official requesting a decision be made on
the oil and gas lease sales due to upcoming deadlines).

On April 21, 2021, BLM issued a "Statement on Second Quarter Oil and Gas Lease Sales"
that provided in part:

> The Interior Department's ongoing review of the federal oil and gas program is assessing compliance with applicable laws and, as directed by Executive Order 14008, reviewing whether the current leasing process provides taxpayers with a fair return.

> Based on our ongoing review, the Bureau of Land Management is exercising its discretion to not hold lease sales in the 2nd quarter of Calendar Year 2021.  This decision does not impact existing operations or permits for valid, existing leases, which continue to be reviewed and approved.  The BLM remains committed to managing our programs in a way that restores balance on public lands, creates jobs, and provides a path to align the management of America's public lands with our nation's climate, conservation, and clean energy priorities….

> The Mineral Leasing Act of 1920 provides the Secretary of the Interior discretion regarding whether to lease Federal lands and, as a result, whether to identify eligible lands that are available to be included in quarterly lease sales.  This discretion has been delegated to the Bureau of Land Management.

> The ongoing review is assessing, among other issues, whether the current leasing process provides taxpayers with a fair return for extraction of the Nation's oil and gas resources; how to ensure it complies with applicable laws, such as the National Environmental Policy Act, and the United States' trust responsibilities; and how it will take into account climate change and environmental justice.  In recent years, courts have found the current leasing process in violation of various governing laws, invalidating both the BLM's guidance and a number of lease sales.  In connection with the review, the BLM will analyze and ensure that any future leasing complies with applicable law—including requirements for evaluating greenhouse gas emissions and climate change impacts—to better withstand administrative and judicial review.  The comprehensive review required by E.O. 14008 has the potential to identify and recommend solutions for serious deficiencies in the leasing regime.

> The Trump administration conducted a fire sale of public lands and waters, offering more than 25 million acres onshore during the past four years, 5.6 million of which were purchased.  Offshore, more than 78 million acres were offered for lease to oil, gas and mineral development offshore, and only 5 million acres were purchased.

BLM-Q2000485. Consistent with this press release, no lease sales were held in Q2 2021.

**Nationwide Preliminary Injunction Enjoining "Pause"**

On June 15, 2021, the Western District of Louisiana entered a nationwide preliminary injunction, which enjoined the DOI and its agencies "from implementing the Pause of new oil and natural gas leases on public lands or in offshore waters as set forth in Section 208 of Executive Order 14008, 86 Fed. Reg. 7619, 7624-25 (Jan. 27, 2021) as to all eligible lands, both onshore, and offshore." *Louisiana v. Biden*, 543 F. Supp. 3d 388, 418-19 (W.D. La. June 15, 2021), *vacated and remanded by Louisiana v. Biden*, 45 F.4th 841, 846 (5th Cir. 2022); BLM-Q3001350. While this preliminary injunction was entered during Q2 2021, it was so late in the quarter (about 15 days before the end of the quarter) that no lease sales in compliance with the applicable federal regulations could have been held within that quarter. *See W. Energy Alliance v. Zinke*, 877 F.3d at 1162 (reflecting the requirement during the times relevant to this case that notice of a lease sale must be posted at least 45 days before the competitive auction[2]). This nationwide preliminary injunction remained in effect throughout Q3 2021.[3]

**Third Quarter 2021 (July through September)**

As before, at least one BLM state office submitted a request to hold a lease sale during Q3 2021. *See* BLM-Q3001026-29 (BLM New Mexico requesting approval to hold July 2021 lease sale for two parcels of federal land). And as before, the administrative record provided by BLM does not indicate any decision on the request. *See* BLM-Q3001029 (showing the "do approve"

---

[2] Effective June 2024, the BLM is now required to post a Notice of Competitive Lease Sale identifying the lands to be offered at competitive bidding least 60 calendar days before the lease sale. 43 C.F.R. § 3120.42(c).

[3] On August 17, 2022, over a year after the preliminary injunction was entered, the Fifth Circuit vacated it, determining it could not "ascertain from the record what conduct—an unwritten agency policy, a written policy outside of the Executive Order, or the Executive Order itself—is enjoined." *State of Louisiana v. Biden*, 45 F.4th 841, 846 (5th Cir. 2022).

and "do not approve" selections unmarked).

In a June 28, 2021 email, BLM leadership stated third quarter lease sales were being contemplated.  BLM-Q3001351 (email from M. Gamper stating, "Not all options are off the table for a 3Q sale as we have two sales that were not completed but could be used.").

An August 17, 2021 email among BLM leadership noted that BLM was "going to be moving forward with leasing."  BLM-Q3001360 (email from N. Culver to M. Gamper).  Similarly, on August 24, 2021, BLM issued a news release stating, "The federal onshore and offshore oil and gas leasing program will continue as required by the [nationwide preliminary injunction] while the government's appeal is pending."  BLM-Q3001363.  A follow-up email to that news release from BLM leadership explained,

> Interior is also continuing to move forward with leasing in accordance with the district court's [preliminary injunction].  Today's statement and court filing confirms that the BLM will be posting parcels for scoping by the end of the month, working from the lease sales that were deferred in Q1 and Q2, then moving forward with analysis of parcels for inclusion in a lease sale.

*Id.*  And in an August 27, 2021 memorandum to BLM State Directors, BLM leadership instructed BLM State Offices to move forward with lease sale preparations, "with the goal of issuing appropriate draft National Environmental Policy ACT ('NEPA') documents for comment in October 2021 and any appropriate notices of sale no later than early 2022."  BLM-Q3001366; *see also* BLM-Q3001367 (August 31, 2021 press release from BLM Colorado noting that it "anticipates publishing a Notice of Competitive Lease Sale later this year").

Together, these documents demonstrate BLM had no intention of holding a lease sale during the third quarter of 2021.  In its brief in this lawsuit, BLM contends it was prevented from holding a Q3 2021 lease sale because it was continuing to address non-compliant NEPA analyses. (ECF 62 p. 45.)  In a declaration submitted in September 2021 for a lawsuit then pending in the

District of North Dakota, Peter Cowan, the Senior Mineral Leasing Specialist for BLM Division of Fluid Minerals, explained:

3.      In recent years, BLM's oil and gas leasing decisions have faced numerous lawsuits under the National Environmental Policy Act (NEPA). Attached to my declaration as Exhibit A is a chart identifying the pending NEPA lawsuits. Altogether, these lawsuits challenge 5,183 oil and gas leases comprising over 4.8 million acres of land across eight BLM offices:

| State | Number of leases challenged | Acres |
|---|---|---|
| CA | 14 | 18,784.20 |
| CO | 685 | 526,349.28 |
| ESO[1] | 37 | 1,826.58 |
| MT | 824 | 392,056.99 |
| NV | 111 | 210,546.75 |
| NM | 444 | 191,792.48 |
| UT | 595 | 848,656.60 |
| WY | 2473 | 2,688,030.76 |
| TOTAL | 5183 | 4,878,043.64 |

4.      Some of these court challenges have resulted in adverse decisions. [Collecting cases.]

…

17.      In light of the significant number of disruptive NEPA challenges described above, the BLM has spent considerable time deliberating how best to adjust its NEPA processes for onshore oil and gas leasing going forward. This process has involved developing an inventory of leases subject to NEPA challenges. In addition, in order to develop more robust NEPA practices, the BLM has been revising its approach to account for greenhouse gas (GHG) emissions when preparing NEPA for proposed lease sales. BLM has begun preparing an inventory of GHGs from fossil fuels produced on lands managed by the BLM in fiscal year 2020 and from reasonably foreseeable fossil fuel production and leasing over the next 12 months, as well as preparing an assessment of future GHG emissions trends from federal fossil fuel development and potential climate change impacts.

BLM-Q3002147-48, 53.[4]  As previously noted, no lease sale was held during the third quarter of

---

[4] This litigation ultimately culminated in a settlement between the Plaintiff conservation groups and the Department of Interior, resulting in a voluntary dismissal by the District of Columbia Court, over the objection of the State of Wyoming and other Intervenor-Defendants. *See Wildearth Guardians, et al., v. Debra Haaland, Secretary of the Department of Interior*, 2022 WL 1773474 (D.D.C. June 1, 2022).

2021.

**Third and Fourth Quarters 2022 (July through December)**

The administrative record provided by BLM offers nothing that might explain its lack of lease sales for the second half of 2022, at least nothing contemporaneous in time to 2022. The record consists only of nominations requesting certain parcels of land in Wyoming be considered for competitive bidding. *See* WY22Q3000001-WY22Q3000345.

## DISCUSSION

The Court first considers some preliminary arguments raised by BLM and Intervenor-Respondents, starting with the assertion that Wyoming's claims are barred by the Mineral Leasing Act's statute of limitations.

1.     **Whether Wyoming's Claims are Time-Barred**

The MLA precludes any "action contesting a decision of the Secretary involving any oil and gas lease" "unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter." 30 U.S.C. § 226-2. Wyoming initially filed this lawsuit on November 28, 2022 (ECF 1), challenging only the failure to hold a lease sale during the second and third quarters of 2021, which were more than a year before Wyoming filed suit. A few days after filing suit, Wyoming amended its petition for review to also challenge the failure to hold a lease sale during the third quarter of 2022. (ECF 6.)

BLM argues the challenges related to 2021 are self-evidently beyond the limitations period. And BLM says the Q3 2022 challenge is allegedly beyond the 90-day period because Wyoming attacks BLM's failure to issue a timely announcement to hold a Q3 2022 lease sale, and the deadline for such an announcement, factoring in the 45-day notice requirement, had expired more than 90 days before Wyoming's lawsuit. Wyoming responds that it is BLM's pre-lease-sale

decisions that are at issue in this case and not "a decision of the Secretary involving any oil and gas lease" because such a lease cannot come into existence until after a lease sale is held. Accordingly, contends Wyoming, the general six-year statute of limitations for suits against the United States, 28 U.S.C. § 2401(a), governs this action.

The Tenth Circuit has not had occasion to expressly determine the scope of § 226-2, but all statutory interpretation questions begin with the language of the statute.

> The goal of statutory interpretation is to ascertain the congressional intent and give effect to the legislative will. In conducting this analysis, we first turn to the statute's plain language. We give undefined terms their ordinary meanings, considering both the specific context in which the word is used and the broader context of the statute as a whole.

*Kansas Nat. Res. Coal. v. United States Dep't of Interior*, 971 F.3d 1222, 1235 (10th Cir. 2020) (quoting *In re Taylor*, 899 F.3d 1126, 1129 (10th Cir. 2018)).

The statutory text here says: "No action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter." 30 U.S.C. § 226–2. The operative question is whether Wyoming's claims "contest[] a decision of the Secretary involving any oil and gas lease." BLM argues this covers a broad scope of conduct because the word "'involving' is broad and is indeed the functional equivalent of 'affecting.'" (ECF 62 p. 28 (quoting *Allied-Bruce Terminix Co., Inc. v. Dobson*, 513 U.S. 265, 273-74 (1995).) The Court agrees this language is broad, but it's not as broad as BLM contends. Even assuming this statute touches on a Secretarial decision "affecting" any oil and gas lease, this case is not about "any oil and gas lease." Petitioners complain of their inability to bid at auction on potential oil and gas leases, but the leases themselves do not exist. Thus, the challenged BLM decisions more accurately "involve" or "affect" bidding opportunities as opposed to oil and gas leases. The Court

concludes Wyoming has the better argument on this matter.

The Court notes, though, that Tenth Circuit dicta exists that both supports and challenges the Court's interpretation of § 226-2. Specifically, the Tenth Circuit has commented in dicta that the "statute of limitations at issue here applies only to actions contesting either the lease issuance or substantive decisions relating to the lease itself." *Park County Res. Council, Inc. v. U.S. Dep't of Agric.*, 817 F.2d 609, 616 (10th Cir. 1987), *overruled on other grounds by Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992). This sentence would seem to support this Court's construction of § 226-2's plain language. In the very next sentence, though, the Tenth Circuit added, "It applies in cases challenging lack of compliance with all the intricate requirements of Subchapter IV of the [MLA] which deals with oil and gas leasing." *Id.* This sentence would seem to capture Wyoming's claims in this lawsuit (and thereby preclude at least some of them on statute-of-limitations grounds). The Court does not find the language of § 226-2 extends quite so far, though, because Congress was capable of saying the statute applies to claims challenging a lack of MLA compliance if it so desired. Instead, though, Congress limited the statute's application to decisions "involving any oil and gas lease." And this is consistent with the cases applying § 226-2 reviewed by the Court—they involved leases that already existed or refusals to issue certain leases following lease sales. *See, e.g., Impact Energy Res., LLC v. Salazar*, 693 F.3d 1239, 1241 (10th Cir. 2012) (applying § 226-2 where oil and gas developers had submitted the winning bids at a lease sale for certain oil and gas leases, and then sued after BLM later decided not to lease the parcels).

In sum, despite the Tenth Circuit's rather broad dicta, the Court does not interpret § 226-2 to reach every type of claim possible under the oil and gas leasing provisions of the MLA. And because this case challenges actions (or inactions) preceding a lease sale and does not involve an

oil and gas lease that either exists or was already sold at a lease sale, the Court concludes § 226-2 does not apply to Petitioners' claims.  Therefore, the default six-year statute of limitations for civil claims against the United States under 28 U.S.C. § 2401(a) applies here, and none of Wyoming's claims are time-barred.[5]

### 2.    <u>Whether Industry Petitioners Lack Constitutional Standing</u>

Next, the Court takes up BLM's argument that Petitioners Western Energy Alliance and Petroleum Association of Wyoming (collectively, "Industry Petitioners") lack legal standing to pursue their claims in this case.  (*See* ECF 63 pp. 25-28.)

Article III, Section 2 of the U.S. Constitution limits federal courts' jurisdiction to "Cases" and "Controversies."  "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). "For federal courts to have jurisdiction over an action, 'the party bringing the suit must establish standing.'" *The Wilderness Soc. v. Kane Cty., Utah*, 632 F.3d 1162, 1168 (10th Cir. 2011) (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004)); *see Sprint Communications Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008) (Article III's "case-or-controversy requirement is satisfied only where a plaintiff has standing").

For a plaintiff to possess Article III standing, the law requires:

> (1) that the plaintiff have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely,

---

[5]  Even if § 226-2 applied here, Wyoming's challenge to the lack of lease sales in Q3 2022 would not be time-barred. The 90-day clock starts upon the claim's accrual.  *Impact Energy Res., LLC v. Salazar*, 693 F.3d 1239, 1245-46 (10th Cir. 2012).  The claim that BLM improperly failed to a hold a lease sale for eligible, available lands during the third quarter of 2022 did not accrue until that quarter ended without a lease sale.  BLM suggests this claim accrued at the time it failed to post the required notice of a lease sale, but a claim of improper notice is different than the claim asserted by Petitioners here of failure to a hold a quarterly lease sale.

as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 167 (1997); *see also W. Watersheds Project v. Interior Bd. of Land Appeals*, 62 F.4th 1293, 1296-97 (10th Cir. 2023). As the party attempting to invoke federal jurisdiction, the plaintiff bears the burden of establishing standing. *Spokeo*, 578 U.S. at 338. So long as at least one plaintiff possesses standing to sue, "the suit may proceed." *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) (citing *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52, n.2 (2006)). At the merits briefing stage of this judicial review action, the party asserting Article III standing "must produce evidence on each element of standing as if it were moving for summary judgment in district court. To prove these elements, [Industry Petitioners] must proffer 'specific facts' supported by 'affidavit or other evidence.'" *N. Laramie Range All. v. FERC*, 733 F.3d 1030, 1034 (10th Cir. 2013).

Industry Petitioners are organizations made up of member-companies. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977)).

Industry Petitioners have not shown any of their members would have standing to sue in their own right. Industry Petitioners filed their first petition for review in Case No. 22-CV-252-SWS on December 5, 2022, challenging the lack of Q3 2022 lease sales. (22CV252 ECF 1.) Then on January 3, 2023, Industry Petitioners filed a petition for review in Case No. 23-CV-1-SWS to challenge the lack of Q4 2022 lease sales. (23CV1 ECF 1.) The petition for reviews' allegations establish that Industry Petitioners' members have acquired federal oil and gas leases through lease

sales in the past, and they seek to acquire more through additional participation in lease sales.  (*See* 22CV252 ECF 1 ¶¶ 1-2, 49-50, 55-56, 62, 75; 23CV1 ECF 1 ¶¶ 1-2, 49-50, 56-57, 63, 76.)   These allegations are too generic and hypothetical to grant them standing to sue in this lawsuit, though. The "injury in fact" requirement demands a "concrete and particularized" injury that is "actual or imminent."  But Industry Petitioners do not allege that any of their members would have bid or otherwise participated in any of the 2022 lease sales that Petitioners contend should have been conducted.  The administrative record shows that during the 2017-2021 administration of President Trump, BLM offered more than 25 million acres of onshore federal lands for lease sale, but only 5.6 million acres of leases were purchased.  BLM-Q2000485.  So despite those parcels being nominated for evaluation and then offered for lease, the great majority of the eligible and available lands were not bid on and leased.  This demonstrates that just because an Industry Petitioner member nominated a certain parcel does not mean the member has been concretely and actually injured by the lack of opportunity to bid on the right to lease the parcel.  And Industry Petitioners' general allegation that BLM violated the MLA is also not enough to convey standing.  *See Spokeo*, 578 U.S. at 341 ("Article III standing requires a concrete injury even in the context of a statutory violation.").

U.S. Supreme Court precedent "require[s] plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).  "This requirement of naming the affected members has never been dispensed with in light of statistical probabilities, but only where *all* the members of the organization are affected by the challenged activity."  *Id.* at 498-99 (emphasis in original).  Here, Industry Petitioners have not specifically identified one or more member-companies that suffered a particularized, concrete injury by the lack of Q3 and Q4 2022 lease sales,

nor have Industry Petitioners shown (or asserted) that every single member was similarly injured or affected by the failure to hold the challenged lease sales. Industry Petitioners have not identified members "who have suffered the requisite harm" sufficient to claim organizational standing. *Id.* at 499.

Industry Petitioners include the declarations of Kathleen Sgamma, President of WEA, and Pete Obermueller, President of PAW, with their opening brief. (ECF 54-1, 54-2.) However, these declarations do not establish that any member was directly injured or affected by the lack of lease sales during the third and fourth quarters of 2022. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992) ("To survive the Secretary's summary judgment motion, respondents had to submit affidavits or other evidence showing, through specific facts, not only that listed species were in fact being threatened by funded activities abroad, but also that one or more of respondents' members would thereby be "directly" affected apart from their "'special interest' in th[e] subject.") (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *see also N. Laramie Range Alliance*, 733 F.3d at 1034 (at the merits stage of the proceeding, the petitioner "must proffer specific facts supported by affidavit or other evidence" that shows the petitioner "had standing when it filed its petition for review") (internal quotations omitted). Indeed, Industry Petitioners have not even asserted that a member specifically intended to participate in the Q3 and Q4 2022 lease sales and was injured when those lease sales did not occur. At best, the Court can presume only that some of the members "might have" bid on certain parcel leases had a lease sale occurred, but such an alleged injury is only conjectural and does not satisfy constitutional standing. "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers*, 555 U.S. at 496 (2009).

Additionally, the members' lost opportunity to bid on a federal oil and gas lease, by itself,

does not create standing because it fails to assert an injury redressable by a favorable court decision as required by the third part of the standing test.  *See Ash Creek Mining Co. v. Lujan*, 969 F.2d 868, 874 (10th Cir. 1992) (holding that had the petitioner mining company "contended only the loss of the possibility of leasing the federal coal, it would have asserted an injury not redressable by a favorable decision and thus would have lacked Article III standing").

Industry Petitioners' lost possibility of acquiring a federal oil and gas lease does not establish their constitutional standing to participate in this lawsuit, and consequently the Court lacks Article III jurisdiction over their claims.  Therefore, Industry Petitioners' challenges to the lack of lease sales during the third and fourth quarters of 2022, presented in Case Nos. 22-CV-252-SWS and 23-CV-1-SWS, must be dismissed.

### 3.     Merits of Wyoming's Challenges to Q2 2021, Q3 2021, and Q3 2022

With the dismissal of Industry Petitioners' claims, only Wyoming's claims remain at issue. And Wyoming's claims are necessarily limited to the lack of lease sales covering Wyoming lands because it does not possess standing to seek redress for another State's alleged economic injury arising from a lack of quarterly lease sales.

### 3.1     The Basic Structure of 30 U.S.C. § 226

Much of Wyoming's opening brief is centered around its contention the DOI Secretary "deviated from existing policy and adopted a new interpretation when she concluded that she has the discretion not to hold any lease sales."  (ECF 53 pp. 34-37, 28-56.)  A review of BLM's discretionary decisions versus required actions under § 226 may be helpful here.

As noted earlier, § 226(a) provides, "All lands subject to disposition under this chapter which are known or believed to contain oil or gas deposits **may be leased** by the Secretary."  30 U.S.C. § 226(a) (emphasis added).  When considering statutory language, "the use of the word

'may' creates a presumption of discretion under normal rules of statutory interpretation, in contrast with the mandatory 'shall.'" *Mukantagara v. Mayorkas*, --- F. Supp. 3d ---, No. 2:20-CV-00897-RJS-DAO, 2024 WL 2393060, at \*5 (D. Utah May 23, 2024) (quoting *Zhu v. I.N.S.*, 300 F. Supp. 2d 77, 81 (D.D.C. 2004); *see also Maine Community Health Options v. United States*, 590 U.S. 296, 310 (2020) (noting that "may" "implies discretion"); *Haig v. Agee*, 453 U.S. 280, 294 n.26 (1981) (noting that "'may' expressly recognizes substantial discretion"); *Green v. Napolitano*, 627 F.3d 1341, 1344 (10th Cir. 2010) ("Employing conditional terms such as 'may' and 'at any time,' the statute uses language that is 'indicative of administrative discretion.'") (quoting *Jilin Pharmaceutical USA, Inc. v. Chertoff*, 447 F.3d 196, 203 (3d Cir. 2006)).  And as mentioned above, the Tenth Circuit has reaffirmed that § 226(a) "continues to vest the Secretary with considerable discretion to determine which lands will be leased." *W. Energy Alliance v. Salazar*, 709 F.3d at 1044.

Subsection 226(b) then sets out the procedures to be followed for "[a]ll lands to be leased." Specifically at issue in this case, subsection (b)(1)(A) says, "Lease sales **shall be held** for each State where eligible lands are available at least quarterly …." 30 U.S.C. § 226(b)(1)(A) (emphasis added).  "[T]he word 'shall' usually connotes a requirement." *Maine Community Health Options v. United States*, 590 U.S. 296, 310 (2020) (quoting *Kingdomware Technologies, Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016)); *see also Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("the mandatory 'shall' … normally creates an obligation impervious to … discretion").  However, Congress did not define what constitutes "eligible" and "available" lands.[6]  BLM has interpreted "eligible" to mean lands that are "not excluded from

---

[6]  In the prior related lawsuit challenging the cancelation of certain lease sales in early 2021, this Court found DOI/BLM's interpretations of "eligible" and "available" to be reasonable and deferred to the agency's interpretations under the *Chevron* deference doctrine announced in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,

leasing by a statutory or regulatory prohibition." BLM-Q2000024; *see also* BLM-Q2000017. For example, leasing is excluded in national parks and within an incorporated city or town. 43 C.F.R. § 3100.3(a)(2)(i), (a)(2)(iii). And the agency has interpreted "available" to mean lands that are open to leasing in the applicable resource management plan (RMP) and that have met all statutory requirements and reviews, including required NEPA analyses. BLM-Q2000024; *see also* BLM-Q2000017.

With *Loper Bright* sounding the death knell of *Chevron* deference, *see supra* note 5, construing the phrase "where eligible lands are available" falls to the Court without deference to the agency's interpretation, but while acknowledging that "[c]areful attention to the judgment of the Executive Branch may help inform that inquiry." *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). As noted earlier, when construing statutory language, the Court gives "undefined terms their ordinary meanings, considering both the specific context in which the word is used and the broader context of the statute as a whole." *Kansas Nat. Res. Coal.*, 971 F.3d at 1235.

"Eligible" is defined in Black's Law Dictionary as "[f]it and proper to be selected or to receive a benefit; legally qualified for an office, privilege, or status." *Eligible*, Black's Law Dictionary (12th ed. 2024). It is similarly defined by Merriam-Webster in relevant part as "qualified to participate or be chosen." *Eligible*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/eligible (last visited Dec. 19, 2024). Applying these common meanings of "eligible" to § 226(b)(1)(A), "eligible lands" are those that are legally

---

467 U.S. 837 (1984). *W. Energy Alliance v. Biden*, No. 21-CV-13-SWS, 2022 WL 18587039, at *9 (D. Wyo. Sept. 2, 2022). After that decision and while this instant lawsuit was under consideration, the U.S. Supreme Court issued *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), which overruled *Chevron* deference and instructed that "the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* at 2263.

qualified to participate in leasing, and to be legally qualified for leasing, "eligible lands" must necessarily be those that are not excluded from leasing by law. This accords with BLM's definition that "eligible lands" are those that are not excluded from leasing by a statutory or regulatory prohibition.

Turning now to "available," Black's suggests it means "[l]egally valid or colorable." *Available*, Black's Law Dictionary (12th ed. 2024). And Merriam-Webster defines it in relevant part as "present or ready for immediate use." *Available*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/available (last visited Dec. 19, 2024). Applied to § 226(b)(1)(A), "available lands" are those that are legally valid and ready for leasing, which demands that the lands meet the relevant statutory requirements, such as NEPA. This too accords with the agency's definition that "available lands" are leasable under the applicable RMP and have met all statutory requirements and reviews.

While not deferring to the agency's definition of "eligible" and "available" lands, but while noting the agency's definition helps inform the Court's interpretation, the Court concludes "eligible" lands are those that are not precluded from leasing by law and "available" lands are those that have met all statutory requirements and reviews necessary to be leased. With these meanings in mind, the Court turns to the merits of whether BLM abused its discretion or acted arbitrarily and capriciously by failing to hold quarterly lease sales of eligible, available lands.

### 3.2    <u>Second and Third Quarters 2021</u>

Recall that BLM issued a public statement on April 21, 2021, concerning Q2 2021 lease sales, where it said in relevant part:

> The Interior Department's ongoing review of the federal oil and gas program is assessing compliance with applicable laws and, as directed by Executive Order 14008, reviewing whether the current leasing process provides taxpayers with a fair return.

Based on our ongoing review, the Bureau of Land Management is exercising its discretion to not hold lease sales in the 2nd quarter of Calendar Year 2021….

The ongoing review is assessing, among other issues, whether the current leasing process provides taxpayers with a fair return for extraction of the Nation's oil and gas resources; how to ensure it complies with applicable laws, such as the National Environmental Policy Act, and the United States' trust responsibilities; and how it will take into account climate change and environmental justice.  In recent years, courts have found the current leasing process in violation of various governing laws, invalidating both the BLM's guidance and a number of lease sales.  In connection with the review, the BLM will analyze and ensure that any future leasing complies with applicable law—including requirements for evaluating greenhouse gas emissions and climate change impacts—to better withstand administrative and judicial review.  The comprehensive review required by E.O. 14008 has the potential to identify and recommend solutions for serious deficiencies in the leasing regime….

BLM-Q2000485.

This Court previously discussed the cases referenced in BLM's press release, which had "found the current leasing process in violation of various governing laws" and had affected BLM's lease sales in early 2021:

[In February 2021], BLM Utah switched gears and sought authority to postpone its March 2021 lease sale over concern the Environmental Assessment (EA) did not satisfy the then-recent federal court decision in *Rocky Mountain Wild v. Bernhardt*, 2:19-CV-00929 (2020 U.S. Dist. LEXIS 233142), which had found a prior Utah EA inadequate.  The BLM Deputy Director of Operations approved the postponement to give BLM Utah additional time to determine whether the recent court opinion required a new or amended EA.  The next day, BLM Eastern States likewise sought authority to postpone its March 2021 lease sale over concern its EA needed additional air quality analysis in light of the then-recent federal court decision in *WildEarth Guardians v. Bernhardt*, 16-CV-01724 (D.D.C. Nov. 13, 2020), which determined the EAs for certain Wyoming lease sales violated the National Environmental Policy Act (NEPA) by lacking a sufficient analysis of greenhouse-gas emissions.  BLM's Deputy Director of Operations authorized this second requested postponement.

On February 12, 2021, an Acting Deputy Solicitor for the DOI issued a memorandum recommending the March 2021 lease sales for Colorado, Montana/Dakotas, Utah, and Wyoming similarly be postponed over concern the EAs for the proposed lease sales did not satisfy NEPA because they lacked sufficient analysis of greenhouse-gas emissions.  The memorandum explained this

concern was driven by then-recent federal court decisions that had "remanded or vacated agency actions for want of proper analysis of greenhouse emissions." ([A.R. 1169-70] (citing *Columbia Riverkeeper v. United States Army Corps of Engrs.*, No. 19-6071, 2020 WL 6874871 (W.D. Wash. Nov. 23, 2020), and *WildEarth Guardians v. Bernhardt*, No. 16-1724, 2020 WL 6701317 (D.D.C. Nov. 13, 2020).) The memorandum asserted, "The parcels proposed for each of the above lease sale[s] are not now 'eligible' and 'available' because, at a minimum, BLM has not completed its NEPA analysis." The DOI Assistant Secretary for Land and Mineral Management concurred with the suggestion to postpone the March 2021 lease sales for Colorado, Montana/Dakotas, Utah, and Wyoming. As of February 12, 2021, the BLM Wyoming website announced that "lease sales in Colorado, Montana, Utah, and Wyoming are postponed to confirm the adequacy of underlying environmental analysis."

*W. Energy Alliance. v. Biden*, 2022 WL 18587039, at *4 (internal footnotes and citations omitted). Because of BLM's concern that its then-pending Q1 2021 lease sales were in danger of being vacated by even more lawsuits, this Court found the cancelation and postponement of those Q1 2021 lease sales in order to give BLM the opportunity to ensure compliance with all statutory requirements did not violate the MLA, FLPMA, or NEPA, and were not arbitrary and capricious or an abuse of discretion under the APA. *Id.* at *8-13.

The administrative record reveals these concerns and corrective efforts persisted into the second quarter and third quarters of 2021, which the Court finds to be reasonable under the circumstances. As this Court discussed in *W. Energy Alliance v. Biden*, in late 2020, BLM had experienced multiple court decisions finding its NEPA analyses for various oil and gas leases had not complied with statutory requirements. *See WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237 (D.D.C. Nov. 13, 2020) (determining BLM violated NEPA by failing to take a sufficient "hard look" at greenhouse-gas emissions concerning lease sales in Wyoming); *Rocky Mountain Wild v. Bernhardt*, 506 F. Supp. 3d 1169 (D. Utah Dec. 10, 2020) (determining BLM violated NEPA by failing to consider reasonable alternatives concerning 59 federal land leases for oil and gas development). Additionally, BLM took note of a decision at that same time from the Western

District of Washington that found the U.S. Army Corps of Engineers committed multiple NEPA violations concerning a natural gas project. *Columbia Riverkeeper v. United States Army Corps of Engineers*, 706 F. Supp. 3d 1127 (W.D. Wash. Nov. 23, 2020) (vacating issued permits and remanding to the Army Corps of Engineers to prepare an Environmental Impact Statement). As the Wyoming BLM State Office determined in November 2020 shortly following the *WildEarth Guardians v. Bernhardt* decision, the court decisions placed multiple leases and lease sales at issue, including some not directly involved in the litigation:

> The supplemental NEPA [that had just been remanded for further analysis] has been carried forward for each lease sale since its completion in early May 2019. Thus, not only are previous leases that were analyzed in 2019 and through the 3rd quarter 2020 now at risk, we are at a critical point in going forward with completing the [Environmental Assessment] and resolving protests for the 4th quarter (December) 2020 sale.

BLM-Q3000585. The Wyoming BLM State Office determined 80 days would be sufficient time "to complete the supplemental NEPA, resolve the protests, and issue the leases," but that was only concerning the Q4 2020 lease sale that had been put in jeopardy by *WildEarth Guardians v. Bernhardt*. BLM-Q3000587-88.

BLM's April 21, 2021 press release noted it was in the process of a systemic review of its leasing process as instructed by Executive Order 14008. BLM-Q200485. And within that review, and in light of the then-recent court decisions that had "found the current leasing process in violation of various governing laws," BLM asserted it would "analyze and ensure that any future leasing complies with applicable law—including requirements for evaluating greenhouse gas emissions and climate change impacts—to better withstand administrative and judicial review." *Id.* Based on the Wyoming BLM State Office believing it could fix the NEPA shortcomings and issue leases to the high bidders in 80 days, which was also before the *Rocky Mountain Wild v. Bernhardt* and *Columbia Riverkeeper v. United States Army Corps of Engineers* decisions that

followed shortly thereafter, the Court does not find it particularly unreasonable for BLM to take several months to complete its "comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices," as required by the January 27, 2021 Executive Order 14008.[7] BLM-Q2000485. Indeed, in a June 2021 declaration submitted in the prior related lawsuit of *W. Energy Alliance v. Biden* (and which appears in the administrative record for this case), BLM's Senior Mineral Leasing Specialist noted that recent lawsuits had effectively challenged more than 5,000 leases covering more than 4.8 million acres of public land nationwide, including over 2,400 leases and 2.6 million acres in Wyoming alone. BLM-Q3001245. The Senior Mineral Leasing Specialist also noted the several court decisions against BLM arising from these lawsuits, including one from the Southern District of Ohio in March 2021. BLM-Q3001246. The extensive effect the litigation was having on BLM's leasing program, and particularly on leasing in Wyoming, is evident.

Similarly, the Office of the Solicitor issued a memorandum in mid-February 2021 noting that proposed Q1 2021 lease sales in Colorado, Montana/the Dakotas, Utah, and Wyoming all raised "serious questions as to NEPA compliance." BLM-Q3001022-23. While this memorandum was specific to the first quarter of 2021 (which is not at issue in this case), it demonstrates the deleterious effect the caselaw was having on BLM's ability to effectively lease federal lands for oil and gas development at this time while also complying with federal law.

As the then-recent court decisions had called into question BLM's compliance with statutory requirements covering a multitude of lease sales and issued leases in multiple states around the nation, BLM's review was considering, among other things, how to ensure future leasing complied with governing laws to withstand judicial review. *Id.* BLM-Q2000485. And

---

[7] The Western District of Louisiana's preliminary injunction, entered June 15, 2021, did not enjoin BLM's systemwide review of its leasing program. *See Louisiana v. Biden*, 543, F. Supp. 3d at 418-19.

the changes brought about by this review of the leasing regime had tangible effects in Wyoming. As the Federal Respondents accurately noted in their response brief:

> The Q3 2021 administrative record reflects the substantial work that BLM did to create a strengthened NEPA approach addressing the serious deficiencies identified with BLM-Wyoming's earlier NEPA approach. *See, e.g.*, 2020 BLM Specialist Report on Annual Greenhouse Gas Emissions and Climate Trends (Oct. 2021), BLM-Q3002462–2574. The record further demonstrates this approach to analyzing GHG emissions materially differs from that previously used by BLM-Wyoming and rejected by the [*WildEarth Guardians v. Bernhardt*] court. *Compare* BLM-Q3000328–350 (reflecting BLM-Wyoming's preexisting approach to evaluation of GHG emissions), and BLM-Q3000585–88 (BLM-Wyoming acknowledging that this approach does not comply with the [*WildEarth Guardians v. Bernhardt*] decision), *with* BLM-Q3002462–2574, 3331–3342, 3527 (reflecting substantially reworked approach to evaluating GHG emissions by October to early November 2021).

(ECF 62 p. 45.) Likewise, BLM issued Instruction Memorandum 2021-027 on April 30, 2021, offering new and supplemental guidance "to ensure that oil and gas lease sales are held in accordance with the Mineral Leasing Act (30 U.S.C. § 226) and other applicable laws[.]" BLM-Q3003544-48.

The lack of compliance with statutory requirements that was determined by the court decisions to exist in the leasing program, and in Wyoming leasing per *WildEarth Guardians v. Bernhardt*, demonstrated the eligible federal lands were not "available" for leasing during the second and third quarters of 2021 while BLM undertook its comprehensive review of the leasing regime. To be sure, unlike its April 21, 2021 press release in which it expressly announced that Q2 2021 lease sales would not take place due to the systemic review, BLM said precious little about not holding lease sales during Q3 2021 at the time.[8] Despite BLM's lack of public statement

---

[8] BLM offered affidavits specific for this litigation that attempt to explain much of its actions during the times at issue in this case, including Q3 2021. (*See* ECF 34-1, 62-3.) These after-the-fact explanations "must be viewed critically" to ensure the agency's actions are not upheld on impermissible "post-hoc rationalization." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1908 (2020) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). Litigation

and less-than-ideal clarity, the agency's path concerning Q3 2021 is reasonably discerned from the administrative record, *see Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, and the reason for its decision to not hold any lease sales is essentially the same as that for Q2—to complete its review and ensure its leases covered lands that were "available" in that they actually met the legal requirements for leasing, including NEPA.

Thus, as to Q2 and Q3 2021, the Court does not find any violation of § 226(b)(1)(A)'s requirement that quarterly lease sales be held "where eligible lands are available" because recent litigation had drawn into question whether the eligible lands in Wyoming were "available" at the time. Further, the Court finds BLM's decisions to refrain from holding Wyoming lease sales during Q2 and Q3 2021 to be reasonably supported by the administrative record and to be a rational choice based on the facts and circumstances at the time. Consequently, the Court does not find BLM's decisions to abstain from holding Q2 2021 and Q3 2021 lease sales covering Wyoming lands to be arbitrary and capricious, an abuse of discretion, or a violation of the MLA.

### 3.3    **Third Quarter 2022**

The analysis and result are different as to the lack of Wyoming lease sales during the third quarter of the following year.

As an initial consideration, BLM argues "Wyoming cannot challenge a decision against holding Q3 2022 sales" because it "did not decline to hold (i.e., decide against holding) lease sales in the third [quarter] of 2022" and instead it simply "did not exercise its discretion to hold onshore lease sales in time for sales in the third [quarter] of 2022." (ECF 62 p. 46 (internal quotations

---

affidavits are "merely 'post hoc' rationalizations … which have traditionally been found to be an inadequate basis for review." *Overton Park*, 401 U.S. at 419. In this case, the Court places little value in BLM's litigation affidavits because "the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record." *Colorado Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006). "It is a 'foundation principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907 (2020) (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015)).

omitted).)   BLM's wordplay is unacceptable and differs from what it has said in past public statements.   There is no question the DOI Secretary (or designee) holds discretion under 30 U.S.C. § 226(a) "to determine which lands will be leased."   *W. Energy Alliance v. Salazar*, 709 F.3d at 1044.   The suggestion that declining to lease lands is not an exercise of this discretion and it's only an exercise of discretion when the decision is made to lease, though, is baseless.   Both leasing lands and not leasing lands are exercises of this discretion.   As BLM accurately said in its own April 21, 2021 press release, "the Bureau of Land Management **is exercising its discretion to not hold lease sales** in the 2nd quarter of Calendar Year 2021."   BLM-Q2000485 (emphasis added). BLM cannot escape Wyoming's challenge or this Court's review by hiding behind a purported wall of inaction.

Federal parcels in Wyoming had been nominated for lease and were pending for Q3 2022. WY22Q3000340-45.   But BLM's administrative record reveals no basis or reason to explain why a lease sale covering Wyoming lands did not occur in Q3 2022.   And as a lease sale covering a large number of parcels in Wyoming had occurred the prior quarter (Q2 2022), BLM's systemic review of its leasing regime had obviously come to an end prior to Q3 2022.

In a litigation affidavit prepared for this lawsuit, the Principal Deputy Director of the BLM, Nada Culver, essentially stated BLM did not have enough time to hold a lease sale in Q3 2022 following the Q2 2022 sales because the Q2 lease sales were so large and had occupied the bulk of the agency's resources.   (ECF 34-1 pp. 3-6.)   As the Court already commented, *see supra* note 7, there is little value in this post hoc rationalization which does not appear anywhere in the administrative record.   *See Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1178 (10th Cir. 2023) ("the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record") (quoting *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560,

1575 (10th Cir. 1994)).  BLM offered no contemporary explanation for its decision to forego Q3 2022 lease sales, and the Court cannot discern one from the administrative record.  There are no contemporaneous emails or correspondence, internal or external, discussing the lack of agency resources creating an inability to conduct a Q3 lease sale.  The administrative record simply offers the Court nothing to explain the agency's actions as to the third quarter of 2022.  *See* WY22Q3000001-345.  It is far from the "substantial evidence" needed to uphold agency action under the APA, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Doyle v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (quotations omitted).  The agency did not invoke any basis or reasoning when it exercised its discretion to not hold a Q3 2022 lease sale covering Wyoming lands.  *See Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015) ("a court may uphold agency action only on the grounds that the agency invoked when it took the action").

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  "[A]n agency must cogently explain why it has exercised its discretion in a given manner[.]"  *Id.* at 48.  The complete dearth of evidence in the administrative record to explain BLM's failure to hold a Wyoming lease sale in Q3 2022 renders the exercise of discretion arbitrary and capricious and an abuse of discretion.

### **<u>Remedy</u>**

The briefing in this matter does not offer much assistance in the way of how this Court can correct BLM's failure to explain its decision concerning a Q3 2022 lease sale.  Wyoming asks only

that the Court "[d]eclare that the Secretary's decision to not hold the Third Quarter 2022 federal oil and gas lease sale in Wyoming was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  (ECF 6 p. 29; *see also* ECF 53 p. 67 (Wyoming's opening brief asking the Court to "declare the Secretary's ... Third Quarter 2022 Wyoming lease sale cancellations unlawful"); ECF 65 p. 37 (Wyoming's reply brief asserting the Court "should find that the Secretary abused her discretion when she implemented the pause and cancelled quarterly lease sales in Wyoming").)  It appears Wyoming simply seeks a declaration that BLM was wrong. To be fair, this is likely due to the fact that "federal courts do not have the power to order competitive leasing," *State ex rel. Sullivan v. Lujan*, 969 F.2d 877, 882 (10th Cir. 1992), so the Court cannot order BLM to hold a lease sale to "make up" for the lack of a Q3 2022 lease sale (assuming, for the moment, that eligible lands were available for leasing at the time).

In light of the limited briefing on what remedy is requested, and more importantly what remedy may be available and appropriate under the caselaw, this Court will direct the parties to file supplemental briefing on what they believe is the appropriate remedy to address the BLM's unsupported exercise of discretion in foregoing a Q3 2022 Wyoming lease sale.[9]  The parties shall file simultaneous, supplemental briefing (limited to ten pages) on or before January 31, 2025.  The parties may then file simultaneous responses (limited to five pages) on or before February 14, 2025.

## CONCLUSION AND ORDER

Wyoming's claims concerning Q2 2021, Q3 2021, and Q3 2022 lease sales are not time-barred by 30 U.S.C. § 226-2, but Industry Petitioners have not established their standing to assert their claims concerning Q3 2022 and Q4 2022 lease sales.   The Court's review of the

---

[9]  Any proposed or suggested remedy by Federal Respondents shall be considered without prejudice to any objection to the substantive finding that its failure to explain its lack of Q3 2022 lease sale was in violation of the APA.

administrative record shows that BLM's exercise of discretion to forego Wyoming lease sales in Q2 2021 and Q3 2021 was not arbitrary and capricious, an abuse of discretion, or a violation of law.  However, the administrative record reveals no basis or reasoning for BLM's exercise of discretion to not hold a Wyoming lease sale during Q3 2022, and therefore that decision is arbitrary and capricious and an abuse of discretion under the APA. Silence does not suffice.

**IT IS THEREFORE ORDERED** that Industry Petitioners' claims concerning Q3 2022 and Q4 2022 lease sales, alleged in Case Nos. 22-CV-252-SWS and 23-CV-001-SWS, are hereby **DISMISSED WITHOUT PREJUDICE FOR LACK OF JURISDICTION**.

**IT IS FURTHER ORDERED** that the State of Wyoming and Federal Respondents shall file simultaneous, supplemental briefing to address what they believe the appropriate remedy should be in light of the Court's determination concerning Q3 2022 lease sales covering Wyoming lands.  The parties shall file this supplemental briefing (limited to ten pages) **on or before January 31, 2025**.  The parties may then file simultaneous responses (limited to five pages) **on or before February 14, 2025**.  Intervenor-Respondents are granted leave to file their own supplemental briefing, if desired, under the same page restrictions and deadlines.

**DATED:** December 31st, 2024.

Scott W. Skavdahl
United States District Judge